**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| Raul Garza Marroquin, *et al.*, | § | |
| | § | |
| Petitioners/Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 5:20-cv-54 |
| | § | |
| Jose Longoria, Jr., *et al.*, | § | |
| | § | |
| Respondents/Defendants. | § | |

**DEFENDANTS' MOTION TO DISMISS AND RESPONSE TO
GIORGE GONZALEZ'S AND RAFAEL OLVERA'S PETITIONS FOR IMMEDIATE
<u>INJUNCTIVE RELIEF</u>**

RYAN K. PATRICK
United States Attorney

By:   Ariel N. Wiley
Assistant United States Attorney
*Attorney-in-Charge*
Southern District No. 2554283
Texas Bar No. 24093366
Annalisa L. Cravens
Assistant United States Attorney
Southern District No. 2791281
Texas Bar No. 24092298
1000 Louisiana Street, Suite 2300
Houston, Texas 77002
Tel.: (713) 567-9000
Fax: (713) 718-3303
Email: Ariel.Wiley@usdoj.gov
Email: Annalisa.Cravens@usdoj.gov

*Counsel for Respondents/Defendants*

## Table of Contents

Table of Authorities ................................................................................................................ ii

Exhibits .................................................................................................................................. vii

Introduction and Summary .................................................................................................... 1

Factual and Procedural Background ...................................................................................... 2

Issues ...................................................................................................................................... 9

Standard ................................................................................................................................. 10

Argument ............................................................................................................................... 11

    I.    Under Fifth Circuit precedent, Plaintiffs cannot invoke habeas corpus to challenge the conditions of their confinement. ................................................................................ 11

    II.    Plaintiffs' direct constitutional claims seeking release are not cognizable, and, even if they were, the facts here do not support a constitutional violation................................. 13

        a.    Plaintiffs do not plead a constitutional violation. ............................................... 13

        b.    The proactive measures Defendants have taken to prevent COVID-19 show that they are neither punishing Plaintiffs nor deliberately indifferent to their needs. ................................................................................................................. 15

    III.    Plaintiffs do not state claims under the Rehabilitation Act................................................. 18

        a.    Courts across the country do not recognize Rehabilitation Act claims by federal detainees, and Plaintiffs' claims relating to their removal procedures are barred…………………………………………………………………………....18

        b.    Even if they could bring Rehabilitation Act claims, Plaintiffs allege in only conclusory fashion that they have been excluded from activities or programs because of their disabilities. ........................................................................... 21

    IV.    This Court should not micromanage the detention centers' measures to prevent COVID-19. ...................................................................................................................... 24

    V.    The public interest favors Plaintiffs' continued detention. ....................................... 25

Conclusion ............................................................................................................................. 25

Certificate of Service ............................................................................................................ 26

## Table of Authorities

Page(s)

**Cases**

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ........................................................................................ 19

*Alexander v. Trump,*
    753 F. App'x 201 (5th Cir. 2018) .................................................................. 14

*Arce v. Louisiana,*
    226 F. Supp. 3d 643 (E.D. La. 2016) ............................................................ 21

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................................ 10

*Bell v. Wolfish,*
    441 U.S. 520 (1979) ........................................................................................ 14

*Bellikoff v. Eaton Vance Corp.,*
    481 F.3d 110 (2d Cir. 2007) .......................................................................... 19

*Bennett–Nelson v. Louisiana Board of Regents,*
    431 F.3d 448 (5th Cir.2005) ........................................................................... 21

*Bivens v. Six Unknown Federal Narcotics Agents,*
    403 U.S. 388 (1971) ................................................................................. 11, 14

*Bryant v. Madigan,*
    84 F.3d 246 (7th Cir.1996) ............................................................................. 21

*Cadena v. El Paso County,*
    946 F.3d 717 (5th Cir. 2020) .......................................................................... 21

*Carlson v. Landon,*
    342 U.S. 524 (1952) ........................................................................................ 23

*Dawson v. Asher,*
    2020 WL 1704324 (W.D. Wash. Apr. 8, 2020) ........................................... 18

*De Dandrade v. U.S. Dep't of Homeland Sec.*,
    367 F. Supp. 3d 174 (S.D.N.Y. 2019) ...................................................................... 19

*Demore v. Kim*,
    538 U.S. 510 (2003) ...................................................................... 23

*Domino v. Tex. Dep't of Criminal Justice*,
    239 F.3d 752 (5th Cir. 2001)...................................................................... 14

*EEOC v. Agro Distrib.*,
    555 F.3d 462 (5th Cir. 2009)...................................................................... 21

*Fraihat v. U.S. Immigration & Customs, Enf't*,
    2020 WL 1932570 (C.D. Cal. Apr. 20, 2020)...................................................... 24, 25

*Garrett v. Thaler*,
    560 F. App'x 375 (5th Cir. 2014) ...................................................................... 21

*Gobert v. Caldwell*,
    463 F.3d 339 (5th Cir. 2006)...................................................................... 14

*Hearth, Inc. v. Dep't of Public Welfare*,
    617 F.2d 381 (5th Cir. 1980)...................................................................... 14

*Hernandez v. Garrison*,
    916 F.2d 291 (5th Cir. 1990)...................................................................... 11

*Hurtado v. Reno*,
    34 F. Supp. 2d 1261 (D. Colo. 1999) ...................................................................... 19

*Inko-Tariah v. Lappin*,
    2009 WL 8652932 (E.D.N.C. Apr. 1, 2009)........................................................... 20

*Jorge V. S. v. Green*,
    2020 WL 1921936 (D.N.J. Apr. 21, 2020) ........................................................... 18

*Khan v. Fort Bend Indep. Sch. Dist.*,
    561 F. Supp. 2d 760 (S.D. Tex. 2008) ...................................................................... 10

*Livas v. Myers*,
    2020 WL 1939583 (W.D. La. Apr. 22, 2020)................................................... 11, 13

*Martinez v. Mathews*,
    544 F.2d 1233 (5th Cir.1976)...................................................................... 10

*Mathis, v. GEO Group, Inc.*,
    2009 WL 10736631 (E.D.N.C. Nov. 9, 2009) ........................................................................ 19

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................................................ 25

*Northup v. Thaler*,
    2012 WL 4068676 (S.D. Tex. Aug. 7, 2012).......................................................................... 12

*Nottingham v. Richardson*,
    499 F. App'x 368 (5th Cir. 2012) .......................................................................................... 21

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999) .......................................................................................................... 21, 22

*P.L. v. U.S. Immigration & Customs, Enf't*,
    2019 WL 2568648 (S.D.N.Y. June 21, 2019)........................................................................ 20

*Patrick v. Whitaker*,
    2019 WL 588465 (S.D. Tex. 2019)......................................................................................... 12

*Pierre v. United States*,
    525 F.2d 933 (5th Cir. 1976)............................................................................................ 11, 13

*Poree v. Collins*,
    866 F.3d 235 (5th Cir. 2017).................................................................................................. 11

*Rivera Rosa v. McAleenan*,
    2019 WL 5191095 (S.D. Tex. 2019)....................................................................................... 12

*Roark v. Flanery*,
    2014 WL 4447451 (E.D. Tex. Sept. 9, 2014) ........................................................................ 19

*Rourke v. Thompson*,
    11 F.3d 47 (5th Cir. 1993)................................................................................................. 11, 13

*Sacal-Micha v. Longoria*,
    2020 WL 1815691 (S.D. Tex. Apr. 9, 2020) ................................................................ *passim*

*Sacal-Micha*,
    2020 WL 1518861................................................................................................................... 18

*Sandler v. Anderson*,
    2008 WL 2610130 (W.D. Mo. July 2, 2008) ........................................................................ 20

*Sarres Mendoza v. Barr*,
　2019 WL 1227494 (S.D. Tex. 2019) ........................................................................ 12

*Schipke v. Van Buran*,
　239 F. App'x 85 (5th Cir. 2007) ............................................................................ 11

*Sepulvado v. Jindal*,
　729 F.3d 413 (5th Cir. 2013) ................................................................................ 10

*Shepherd v. Dallas Cty.*,
　591 F.3d 445 (5th Cir. 2009) .......................................................................... 14, 15

*Spencer v. Bragg*,
　310 F. App'x 678 (5th Cir. 2009) .......................................................................... 12

*United States v. Martinez-Fuerte*,
　428 U.S. 543 (1976) ............................................................................................. 25

*United States v. Robinson*,
　2009 WL 1507130 (S.D. Tex. 2009) ...................................................................... 11

*Valentine v. Collier*,
　No. 20-20207, 2020 WL 1934431 (5th Cir. Apr. 22, 2020) .................... 15, 16, 17, 24

*Wells v. Thaler*,
　460 F. App'x 303 (5th Cir. 2012) .......................................................................... 21

*Williams v. Meese*,
　926 F.2d 994 (10th Cir. 1991) .............................................................................. 20

*Wolcott v. Sebelius*,
　635 F.3d 757 (5th Cir. 2011) ................................................................................ 10

*Wong Wing v. United States*,
　163 U.S. 228 (1896) ............................................................................................. 23

*Youngberg v. Romeo*,
　457 U.S. 307 (1982) ............................................................................................. 25

**Statutes**

8 U.S.C. § 1252(b)(9) ............................................................................................... 20

28 U.S.C. § 2241 ...................................................................................................... 12

29 U.S.C. § 794a(a)(2) .......................................................................................... 19

42 U.S.C. § 1983 .................................................................................................. 11

U.S.C. § 1983 ...................................................................................................... 11

**Rules**

FED. R. CIV. P. 201 ............................................................................................. 10

**Regulations**

8 C.F.R. § 1231(a)(1) ....................................................................................... 2, 4

8 C.F.R. § 1241.1 ............................................................................................. 2, 4

**Exhibits**

| Number | Plaintiff | Description |
|--------|-----------|-------------|
| 1 | Gonzalez | Medical records from Rio Grande Detention Center |
| 2 | Gonzalez | Letter to Deportation Officer re: alleged asthma, dated 4-6-2020 |
| 3 | Gonzalez | Select immigration records |
| 4 | Gonzalez | Declaration by Assistant Field Office Director Cerna (ICE) re: Rio Grande Detention Center |
| 5 | Gonzalez | Declaration by Facility Administrator Javier Aleman re: Rio Grande Detention Center |
| 6 | Olvera | Medical records from Webb County Detention Center |
| 7 | Olvera | Medical records from South Texas ICE Processing Center |
| 8 | Olvera | Select immigration records |
| 9 | Olvera | Declaration by Assistant Field Office Director Cerna (ICE) re: Webb County Detention Center |
| 10 | Olvera | Declaration by Warden Garcia re: Webb County Detention Center |
| 11 | Olvera | Declaration by Dr. Ivens |
| 12 | Olvera | Declaration by Officer in Charge Andrew Huron (ICE) re: transfer to Webb County Detention Center |
| 13 | Both | ICE Guidance re: Custody Review, dated 4-4-2020 |
| 14 | Both | ICE ERO COVID-19 Pandemic Response Requirements, dated 4-10-2020 |

**<u>Introduction and Summary</u>**

Plaintiffs essentially allege that immigration detention is now unconstitutional and ask the Court to order their immediate release. Plaintiffs Giorge Gonzalez and Rafael Olvera Amezcua bring habeas corpus claims alleging that their continued detention at the Rio Grande Detention Center and the Webb County Detention Center, respectively, violate the Fifth Amendment to the Constitution. Their claims focus on their alleged medical vulnerabilities: Olvera suffers from diabetes and hypertension, among other ailments; and although otherwise young and healthy, Gonzalez claims that "since he was about two years old," he has experienced "chronic and severe asthma"—a condition he denied having until a few weeks ago.

Even assuming Plaintiffs' allegations are true, they do not state a claim. The Fifth Circuit does not recognize a conditions-of-confinement habeas corpus claim. And a cause of action against the federal government directly under the Constitution is similarly not cognizable. Even if these claims could be brought in the Fifth Circuit, Plaintiffs have pled merely the potential introduction of a disease coupled with typical conditions of a densely populated detention facility—allegations the Fifth Circuit has made clear do not amount to a constitutional violation. Moreover, the evidence submitted here shows that these allegations are without merit.

Plaintiffs also do not state claims under the Rehabilitation Act where courts across the country have held that federal detainees may not bring Rehabilitation Act claims and where Plaintiffs do not articulate what programs or services they allegedly have been excluded from.

This case—with dubious claims and a detailed record of the actions Defendants are taking to prevent COVID-19—does not warrant this Court's intervention into Defendants' management of their detention centers. Defendants' evolving proactive measures show that they are responsive to the ever-changing threat of COVID-19 and are working to protect their detainees.

**Factual and Procedural Background**

*Giorge Gonzalez.* Gonzalez is a 28-year-old native and citizen of Cuba who applied for admission into the United States at the Gateway to the Americas Port of Entry in Laredo, Texas, on July 2, 2019, and claimed fear of returning to Cuba. (Ex. 3 at 1–2.) He was placed in expedited removal, referred for a credible fear interview, and transferred to the Rio Grande Detention Center in Laredo, Texas, where he remains. (*Id.* at 1, 24.)

After an asylum officer found that Gonzalez had a credible fear of returning to Cuba, Gonzalez was issued a Notice to Appear and placed in removal proceedings under INA section 240. (*Id.* at 23, 35.) On December 30, 2019, Gonzalez filed a Form I-589 seeking asylum, withholding of removal, and protection under the Convention Against Torture. (*See id.* at 4.)

On March 9, 2020, after the merits hearing, the immigration judge denied Gonzalez's petitions and ordered him removed to Cuba. (*Id.*) On March 30, 2020, Gonzalez appealed to the Board of Immigration Appeals (BIA). (*Id.* at 30.) The appeal remains pending. While he awaits his appeal, Gonzalez's removal order is not administratively final. 8 C.F.R. § 1241.1. As a result, the 90-day removal period has not begun. *See* 8 C.F.R. § 1231(a)(1).

Gonzalez reported no history of asthma while in ICE custody until April 2020. When Gonzalez entered the country, he claimed to be in good health, he was not taking any medication, and he did not request any medical attention. (Ex. 3 at 3.) During his initial assessment on July 17, 2019, Gonzalez stated that he did not have asthma. (Ex. 1 at 48.) The first time Gonzalez claimed that he had asthma was on April 6, 2020, when he sent a letter asking for salbutamol, an asthma medication. (Ex. 2 at 1.) On April 9, 2020, he submitted a request for the same medication. (Ex. 1 at 7.) When examined, the medical providers did not find any shortness of breath, and Gonzalez's

lungs were clear. (Ex. 5 ¶ 10.) Gonzalez has not had any asthma attacks or made any other asthma-related complaints during his detention. (*Id.*)

Even after filing this lawsuit based on his alleged chronic and severe asthma, Gonzalez has since stated under oath that he has no medical conditions. On April 17, 2020, Gonzalez provided a sworn statement in connection with his application for admission. (Ex. 3 at 26.) When asked if he had any medical issues, he testified "no." (*Id.* at 27.)

***Rafael Olvera.*** Rafael Olvera is a native and citizen of Mexico who was admitted in the United States at Laredo, Texas, on November 8, 2014, as a nonimmigrant L-1 (Intra Company Transferee) with authorization to remain in the United States for a temporary period not to exceed October 3, 2017. (Ex. 8 at 1-2.) However, he remained in the United States beyond October 3, 2017, without authorization from the Department of Homeland Security (DHS). (*Id.*)

On May 24, 2019, Enforcement and Removal Operations (ERO) officers arrested Olvera. (*Id.*) On the same day, DHS issued a Notice to Appear alleging that Olvera had remained in the United States beyond the authorized period and was removable under section 237(a)(1)(B) of the INA. (*Id.*) Olvera expressed fear of returning to Mexico and filed a Form I-589 asking for asylum, withholding of removal, and protection under the Convention Against Torture. (*See id.* at 4.) Additionally, Olvera filed an application to adjust his status to become a lawful permanent resident (Form I-485). (*Id.*)

In July 2019, the immigration judge denied Olvera's request to be released on bond, finding that he is a flight risk. (*Id.* at 3–4.) The court noted that there was "serious reason to believe that [Olvera] has committed a crime involving moral turpitude" and that there was an "Interpol 'Red Notice' out on behalf of the Mexican government seeking to arrest and prosecute [Olvera] for the crime of generic fraud." (*Id.* at 4.) The court determined that Olvera presented a flight risk because

of his limited eligibility for relief, his pending arrest warrant in Mexico, and his access to "tremendous financial resources." (*Id.*) On August 19, 2019, Olvera again requested release on bond. On September 13, 2019, the immigration judge denied the request, concluding no circumstances had changed. The court noted that Olvera had four active warrants against him and determined him to be a "high flight risk." (*Id.* at 8–9.) On December 17, 2019, the BIA affirmed the immigration judge's determination that the petitioner if a flight risk and that "no bond amount will mitigate that risk." (*Id.* at  16.)

On December 4, 2019, the immigration court in Pearsall, Texas, held Olvera's merits hearing, denied Olvera's applications, and ordered him removed to Mexico. (*Id.* at 13.) On December 13, 2019, Olvera appealed that decision to the BIA. (*Id.* at 20.) The appeal remains pending, and therefore the order of removal is not administratively final. 8 C.F.R. § 1241.1. As a result, the 90-day removal period has not begun. *See* 8 C.F.R. § 1231(a)(1).

In an effort to provide Olvera a more segregated detention setting, ICE decided to transfer him to Webb County Detention Center because it has the capacity to house individuals in smaller dormitories. (*See* Ex. 12.) On April 2, 2020, Olvera arrived at WCDC with his prescribed medications and, prior to booking, was screened for chicken pox, mumps, influenza, and COVID-19. (Ex. 11 ¶ 20.) An intake, Olvera consented to a full medical screening and medical examination to determine his health status and acknowledged the receipt of a Detainee Handbook containing, among other things, medical information including his access to medical care. (*Id.* ¶ 21.) WCDC personnel confirmed that Olvera had not been in close contact with any individual with a confirmed COVID-19 diagnosis within the past 14 days. (*Id.* ¶ 22.) His temperature was 97.3 degrees, and he exhibited no symptoms of any type of respiratory illness. (*Id.*) He was counseled on the importance of proper hygiene, including proper handwashing for at least 20 seconds, coughing into his sleeve

or a tissue, avoiding touching his eyes, nose, and mouth, and the signs of hypertension, hypotension, hyperglycemia, and hypoglycemia. (*Id.*)

Olvera participates in the medical unit's chronic care clinic for treatment of Type II Diabetes, hypertension (high blood pressure), and dyslipidemia (high cholesterol). (*Id.* ¶ 19.) He is prescribed various medications for these conditions, which are administered to him at the requisite times on a daily basis. (*Id.*) Chronic care patients typically are scheduled to see a medical provider at least every six months, or more frequently as designated by a provider, to provide heightened care in order to prevent complications due to certain health conditions. (*Id.*)

Olvera has received consistent medical care at the facility since his arrival. (*Id.* ¶¶ 21–26.) He has not exhibited or complained of any COVID-19 symptoms, and his B/S and B/P levels have dramatically improved since his arrival. (*Id.* ¶ 27.) Since his arrival, Olvera has been in a protective cohort setting and separated from the general population. (*Id.* ¶ 17.)

***ICE Guidance Regarding Custody Reviews.*** On April 4, 2020, Peter Berg, an Assistant Director of Field Operations with ICE, circulated guidance to ICE officers regarding the review of cases of aliens who may be at higher risk for serious illness from COVID-19. (Ex. 13.) Expanding on its earlier instruction to review the cases of aliens over age 70 or who are pregnant, ICE Enforcement and Removal Operations (ERO) identified several categories of cases to be reviewed to re-assess custody: pregnant detainees or those having recently delivered babies; detainees over 60 years old; detainees of any age with chronic illness, including blood disorders, chronic kidney disease, compromised immune systems, endocrine disorders, metabolic disorders, heart disease, lung disease, and neurological or neurodevelopment conditions. (*Id.* at 1–2.) The guidance notes, however, that the presence of one of these favors "may not always be determinative." (*Id.* at 2.)

*ICE ERO COVID-19 Pandemic Response Requirements.* On April 10, 2020, ICE expanded on its earlier guidance and issued COVID-19 Pandemic Response Requirements (PRR) setting forth expectations and assisting ICE detention facility operators to sustain detention operations while mitigating the risk of COVID-19. (Ex. 14 at 3.) The PRR was "developed in consultation with the Centers for Disease Control and Prevention and is a dynamic document that will be updated as additional/revised information and best practices become available." (*Id.*) Among other requirements, the PRR mandates that all ICE detention facilities comply with CDC guidance. (*Id.* at 5–6.) It sets forth in detail specific requirements for staffing, supplies, hygiene, and cleaning practices. (*Id.* at 8–10.) It also provides screening questions for all staff and new entrants. (*Id.* at 12.) And it provides measures to encourage social distancing. (*Id.* at 13–14.) Finally, it sets forth procedures in the event of a positive COVID-19 case. (Id. at 14–16.)

*Rio Grande Detention Center.* Gonzalez is detained at ICE's Rio Grande Detention Center. RGDC is following ICE ERO's COVID-19 Pandemic Response Requirements. (Ex. 4 ¶ 9.) Social visitation has been suspended, and necessary visitors are screened. (Ex. 5 ¶ 14.) All detainees are likewise screened at intake. (Ex. 4 ¶¶ 10–11.) They are assessed for fever and respiratory symptoms, are asked to confirmed if they have had close contact with a person with COVID-19, and whether they have traveled through areas with his rates of the virus. (*Id.* ¶ 11.) Any detainee presenting with symptoms would be isolated and tested. (*Id.* ¶ 12.) If positive, the detainee would remain isolated and receive treatment. (*Id.*) If necessary, the detainee would be transported to a local hospital for treatment. (*Id.*)

In the case of known exposure, asymptomatic detainees would be placed in cohorts with restricted movement for 14 days. (*Id.* ¶ 13.) Cohorting is an infection-prevention strategy that

houses detainees together who were potentially exposed to a person with an infectious organism but are asymptomatic. (*Id.*)

At RGDC, the medical facility provides daily access to sick calls in clinical settings and has an onsite medical infirmary. (*Id.* ¶ 14.) The facility currently has no suspected cases of COVID-19 among the detainee population. (*Id.* ¶ 15.) One employee previously tested positive for COVID-19, but that employee had self-isolated for 20 days before she tested positive. (Ex. 5 ¶ 12.) She has had no contact with RGDC staff or detainees and has not yet returned to work. (*Id.*)

RGDC is currently operating at just 19% capacity. (*Id.* ¶ 8.) Gonzalez's individual dorm is at 35% capacity. (*See id.* ¶ 9.)

RGDC has increased its sanitation efforts in response to COVID-19. Cleaning is continuous throughout the day: shared equipment is cleaned several times per day, transport vehicles are cleaned thoroughly before, during, and after use. (Ex. 4 ¶ 17.) Every week, every housing area is disinfected with a foaming agent from the ceiling to the floor. (Ex. 5 ¶ 13.) Detainees are given three masks per week. (*Id.* ¶ 3.) Detainees are also given double the normal allotment of soap. (*Id.* ¶ 5.) If they ask for more, they will receive it. (*Id.*) Gonzalez has not requested any additional soap or masks. (*Id.* ¶¶ 4, 6.) Detainees are also educated on COVID-19 prevention procedures. (Ex. 4 ¶ 21.)

Gonzalez has displayed no symptoms of COVID-19, and therefore he has not met the criteria for testing per CDC guidance. (*Id.* ¶ 24.)

***Webb County Detention Center.*** The Webb County Detention Center (WCDC), where Olvera is detained, has taken numerous steps to prevent the introduction of COVID-19 into the facility.[1] The facility, which is operated by CoreCivic, is following both CoreCivic's Pandemic

---

[1]     The attached declarations (Exs. 9–11) provide extensive details and evidence of Webb County Detention Center's preventative measures, which are too long to recite within this motion's page limitation.

Coronavirus Plan and ICE ERO's COVID-19 Pandemic Response Requirements. (Ex. 10 ¶¶ 14, 19.) The facility is operating at 74% capacity and houses only 17 ICE detainees at the moment. (*Id.* ¶ 20.) WCDC has had zero confirmed cases of COVID-19 among staff and detainees. (*Id.* ¶ 22.) There are no suspected cases, and no detainees are on medical observation or on quarantine status. (*Id.* ¶ 23.) Following CDC and ICE guidelines, WCDC has suspended social visitation, as well as volunteer entry. (*Id.* ¶ 32.) All persons entering the facility are subject to health screening, which consists of a screening questionnaire and temperature check. (*Id.* ¶ 33.) Attorneys visiting WCDC must bring their own personal protective equipment, and a glass barrier separates attorneys from their clients during their meetings. (*Id.* ¶ 39.) Alternatively, attorneys may speak with their clients by telephone or email. (*Id.* ¶ 42.)

As with visitors and staff, incoming detainees are also screened. (*Id.* ¶ 44.) The new detainees are then housed together for 14 days after intake before being integrated into the facility population. (*Id.* ¶ 47.) During this period, they are monitored daily for potential symptoms. (*Id.*) Detainees are also educated on COVID-19 prevention measures. (*Id.* ¶¶ 48, 52–55.)

WCDC has taken measures to promote social distancing and the spread of germs. ICE detainees are provided two hours of recreation each day, and they are instructed to maintain six feet of physical distance during recreation or free time. (*Id.* ¶ 61.) Also, detainees are provided masks and are encouraged to wear them. (*Id.* ¶ 64.) WCDC has also enhanced its sanitation practices. For example, detainees are given hand sanitizer as well as disinfectant and paper towels to clean their immediate living areas. (*Id.* ¶¶ 71–72, 75.)

Olvera was moved to WCDC because of his age and health. (*Id.* ¶ 25.) WCDC has smaller housing units and thus increased separation capacity. (*Id.* ¶ 29.) Olvera is housed in a protective cohort setting in a twelve-detainee dorm that is currently occupied by only five detainees. (*Id.*

¶¶ 26–27.) He is separated from the rest of the population and not intermixing with other populations. (*Id.* ¶ 27.) Staff entering protective cohort units wear masks and gloves, meals are provided on-unit, and protective cohort detainees recreate together and do not mix with other housing units. (*Id.* ¶ 28.) Olvera has not made any requests for extra supplies like soap, masks, or gloves, or to be housed in an even less populated area. (*Id.*) Olvera has displayed no symptoms of COVID-19, and therefore he has not met the criteria for testing per CDC guidance. (Ex. 4 ¶ 23.)

Plaintiffs filed a habeas corpus petition in this Court on April 15, 2020, seeking their immediate release because they claim that their detention violates their substantive due process rights under the Fifth Amendment. (*See generally* Dkt. 1.) Alternatively, they seek improved conditions. (*Id.*) The U.S. Attorney's Office was served on April 23, 2020. Defendants now move to dismiss Plaintiffs' claims and respond to their request for immediate injunctive relief, in accordance with this Court's order.

### Issues

1.      Whether Plaintiffs may seek release under habeas corpus due to the conditions of their confinement when the Fifth Circuit has made clear such a claim is not cognizable.

2.      Whether Plaintiffs may bring claims directly under the Constitution to seek their release where the Fifth Circuit does not recognize such a claim.

3.      Whether Plaintiffs state claims under the Rehabilitation Act where courts across the country have not allowed Rehabilitation Act claims by federal detainees and where Plaintiffs do not actually allege they cannot participate in their removal proceedings.

4.      Whether this Court should order certain conditions at ICE detention centers where (i) the Central District of California is already doing so; (ii) Plaintiffs do not articulate what improved conditions they would deem satisfactory; and (iii) the Fifth Circuit recently stayed an injunction against the Texas Department of Criminal Justice that imposed detailed COVID-19 prevention measures on the state prisons.

## Standard

Rule 12(b)(6) provides for the dismissal of a complaint that fails to state a claim upon which relief can be granted. In ruling on a 12(b)(6) motion, courts may consider the complaint, its attachments and documents incorporated by reference, and matters of which the court may take judicial notice. *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011); *see also* FED. R. CIV. P. 201. Courts need not accept a plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Wolcott*, 635 F.3d at 763. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678–79. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*

Preliminary injunctive relief is an extraordinary remedy that should not be granted unless the movant establishes the following four elements by a preponderance of the evidence: "(1) there is a substantial likelihood of success on the merits; (2) there is a substantial threat that irreparable injury will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) granting the preliminary injunction will not disserve the public interest." *Khan v. Fort Bend Indep. Sch. Dist.*, 561 F. Supp. 2d 760, 763 (S.D. Tex. 2008) (citation omitted). The movant must unequivocally show the need for preliminary injunctive relief. *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1789 (2014) (internal citations and quotations omitted).

The standard is heightened further when a party seeks mandatory preliminary relief that alters the status quo. *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir.1976). Although Plaintiffs have not yet filed a separate motion for a temporary restraining order or for a preliminary injunction, Defendants respond to their arguments preliminarily. Should they file a motion, Defendants would ask to be given the opportunity to respond more fully.

## Argument

### I.     Under Fifth Circuit precedent, Plaintiffs cannot invoke habeas corpus to challenge the conditions of their confinement.

Plaintiffs invoke habeas corpus to challenge the constitutionality of their conditions of confinement and seek release. But habeas corpus is not a means by which to challenge conditions of confinement. "Simply stated, habeas is not available to review questions unrelated to the cause of detention." *Pierre v. United States*, 525 F.2d 933, 935 (5th Cir. 1976). In other words, a plaintiff "cannot avail himself of the writ of habeas corpus when seeking injunctive relief ***unrelated to the cause of his detention***." *Rourke v. Thompson*, 11 F.3d 47, 49 (5th Cir. 1993) (emphasis added).

The Fifth Circuit, and district courts within this Circuit, have long recognized that habeas corpus actions are the proper vehicle to "challenge the fact or duration of confinement," whereas allegations that challenge an individual's "conditions of confinement" are "properly brought in civil rights actions." *Schipke v. Van Buran*, 239 F. App'x 85, 85–86 (5th Cir. 2007); *see also Poree v. Collins*, 866 F.3d 235, 243 (5th Cir. 2017) (noting the "instructive principle that challenges to the fact or duration of confinement are properly brought under habeas, while challenges to the conditions of confinement are properly brought under [civil rights actions]") (citations omitted); *Hernandez v. Garrison*, 916 F.2d 291, 293 (5th Cir. 1990) (holding that claims of overcrowding, denial of medical treatment, and access to an adequate law library were not proper subjects of a habeas corpus petition); *Livas v. Myers*, 2020 WL 1939583, at *8 (W.D. La. Apr. 22, 2020) ("Neither party nor this Court found a single precedential case in the Fifth Circuit . . . allowing conditions of confinement claims to be brought under § 2241."); *United States v. Robinson*, 2009 WL 1507130, at *4 (S.D. Tex. 2009) ("Claims concerning the conditions of confinement are actionable, if at all, under 42 U.S.C. § 1983 or *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), and not under the habeas corpus statutes.").

Even when a petitioner alleges that inadequate conditions of confinement create the risk of serious physical injury, illness, or death, a petition for a writ of habeas corpus is not the proper vehicle for such a claim. *See, e.g.*, *Spencer v. Bragg*, 310 F. App'x 678, 679 (5th Cir. 2009) (affirming the lower court's dismissal of petitioner's habeas claim even though he alleged that the conditions of confinement endangered his life); *Northup v. Thaler*, 2012 WL 4068676, at *2 (S.D. Tex. Aug. 7, 2012), *rep. & rec. adopted*, 2012 WL 4068997 (S.D. Tex. Sept. 14, 2012) (dismissing petitioner's habeas claim based on alleged risk of abuse by other inmates).

The same is true in the civil immigration context. When a Mexican national sought release from ICE custody due to concerns for COVID-19, another member of this Court dismissed the petition, noting, "The Fifth Circuit has not recognized [habeas corpus as a permissible avenue for relief from alleged inadequate conditions of confinement]." *Sacal-Micha v. Longoria*, 2020 WL 1815691, at *5 n.6 (S.D. Tex. Apr. 9, 2020) (Rodriguez, J.). Likewise, when civil Border Patrol detainees sought release from custody to cure allegedly unconstitutional conditions, that Court noted, "Any person in custody can obtain relief from allegedly inadequate conditions by being released, but this fact does not create a permissible habeas corpus claim when the complaint turns on the conditions of confinement." *Rivera Rosa v. McAleenan*, 2019 WL 5191095, at *18 (S.D. Tex. 2019). *See also Sarres Mendoza v. Barr*, 2019 WL 1227494, at *2 (S.D. Tex. 2019) (denying Honduran detainee's motion for leave to amend because the proposed claims on "conditions of confinement may not be brought in a habeas corpus proceeding, and are actionable, if at all, in a civil rights action"); *Patrick v. Whitaker*, 2019 WL 588465, at *4, n.36 (S.D. Tex. 2019), *appeal dismissed*, 2019 WL 4668409 (5th Cir. 2019) (ICE detainee's "motion for leave to file supplemental pleadings concerning the conditions of his confinement" is denied because "Petitioner's proposed claims are not actionable under 28 U.S.C. § 2241.").

12

"A detention facility's protocols for isolating individuals, controlling the movement of its staff and detainees, and providing medical care are part and parcel of the conditions in which the facility maintains custody over detainees." *Sacal-Micha*, 2020 WL 1815691, at *4. These conditions of confinement are precisely what Plaintiffs challenge here. (*See, e.g.*, Dkt. 1 ¶ 63 ("Once COVID-19 is introduced to the Detention Centers under current conditions, it will be impossible to stop the spread . . . ."); *id.* ¶ 70 ("The ERO PRR is inadequate to provide safe conditions for Petitioners"); *id.* ¶ 100 ("The conditions at the Webb County Detention Center contravene medical and public health directives for risk mitigation.").) Because their request for release is due to the conditions, the Fifth Circuit has barred their claims. If their habeas claims are allowed here, any detainee could simply seek release to sidestep the Fifth Circuit's express admonition that habeas corpus is not a means to challenge conditions of confinement. This loophole would swallow the rule.

Finally, habeas corpus is meant to correct only unlawful detention. Plaintiffs do not challenge the lawfulness of their custody or the cause of their detention. *See Pierre*, 525 F.2d at 935–36; *Livas*, 2020 WL 1939583, at *7–8 (denying prisoners' requests for home confinement because of concerns of COVID-19 and noting that they incorrectly invoked habeas corpus to challenge their lawful imprisonment). Thus, Plaintiffs cannot invoke habeas to seek relief unrelated to the cause of their detention. *See Rourke*, 11 F.3d at 49.

## II. Plaintiffs' direct constitutional claims seeking release are not cognizable, and, even if they were, the facts here do not support a constitutional violation.

### a. Plaintiffs do not plead a constitutional violation.

To the extent Plaintiffs bring direct constitutional claims seeking their release, they may not do so in the Fifth Circuit. "Although there have been a few notable exceptions, the federal courts, and this Circuit in particular, have been hesitant to find causes of action arising directly

from the Constitution." *Alexander v. Trump*, 753 F. App'x 201, 206 (5th Cir. 2018) (rejecting a freestanding constitutional complaint against the FBI seeking injunctive relief). *See also Hearth, Inc. v. Dep't of Public Welfare*, 617 F.2d 381, 382 (5th Cir. 1980) (citing *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), as one "notable exception"). Recognizing a claim directly under the Fifth Amendment to order Plaintiffs' release would be a departure from Fifth Circuit precedent. *See Sacal-Micha*, 2020 WL 1815691, at *5–6.

Even if a direct constitutional claim were cognizable in this Circuit, Plaintiffs have not pled it. In a conditions-of-confinement case, "the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Under Fifth Circuit case law, "isolated examples of illness, injury, or death, standing alone, cannot prove that conditions of confinement are constitutionally adequate. Nor can the incidence of diseases or infections, standing alone, . . . since any densely populated residence may be subject to outbreaks." *Shepherd v. Dallas Cty.*, 591 F.3d 445, 454 (5th Cir. 2009). A detainee does not establish a case simply by alleging that the detention center has disease or infection present or that it may in the future. "Rather, a detainee . . . must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs." *Id.*

Alternatively, if the detainee challenges an officer's episodic act or omission, he must demonstrate that the official acted with deliberate indifference to his medical needs or safety. *See, e.g.*, *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). Officials disregard a risk to an inmate when they "refuse[] to treat him, ignore[] his complaints, intentionally treat[] him incorrectly, or engage[] in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Plaintiffs seem to allege both theories simultaneously. (*See* Dkt. 1 ¶¶ 127–28.)

But Plaintiffs' allegations here do not support either a "pervasive pattern of serious deficiencies in providing for basic human needs" or a "wanton disregard for serious medical needs." Neither Plaintiff alleges that Defendants have failed to provide them with any medical care they may require. Rather, their allegations focus on the fact that they are detained with others in typical detention-facility conditions and cannot exercise social distancing. But, even taking these allegations as true, Fifth Circuit expressly forecloses Plaintiffs' claim: "any densely populated residence may be subject to outbreaks," and the existence of a disease does not state a constitutional violation. *Shepherd*, 591 F.3d at 454. The Fifth Circuit recently reaffirmed this principle in the context of COVID-19 in staying the preliminary injunction order against the Texas Department of Criminal Justice (TDCJ) relating to its COVID-19 prevention procedures. *Valentine v. Collier*, No. 20-20207, 2020 WL 1934431, at *3 (5th Cir. Apr. 22, 2020) (citing *Shepherd*, 591 F.3d at 454). Where the district court imposed detailed procedures on TDCJ, going beyond CDC guidance and impeding TDCJ's ability to adapt to changing circumstances, the Fifth Circuit noted that TDCJ is likely to prevail on the merits of its appeal. *See id.* at *3–4.

> **b. The proactive measures Defendants have taken to prevent COVID-19 show that they are neither punishing Plaintiffs nor deliberately indifferent to their needs.**

In staying the district court's injunction against TDCJ, the Fifth Circuit found that Texas prisoners challenging the prisons' COVID-19 measures failed to show deliberate indifference because "the evidence shows that TDCJ has taken and continues to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus." *Valentine*, 2020 WL 1934431, at *4. The same is true here.

Webb County Detention Center has taken extensive measures to prevent COVID-19:

- CoreCivic is providing ongoing instruction to its facilities consistent with CDC guidelines and state and local health authorities (Ex. 10 ¶ 9.) Recommendations are changing as often as daily. (*Id.*)

- Every day the facilities participate in a CoreCivic Emergency Operations Center conference call to review current and new protocols and receive updates. (*Id.* ¶ 10.)

- All CoreCivic facility administrators have access to a SharePoint cite with all updated protocols. (*Id.*)

- CoreCivic has activated its Incident Command Center for more effective communication. (*Id.* ¶ 11.)

- CoreCivic issued an initial Pandemic Coronavirus Plan in February 2020. (*Id.* ¶ 14.)

- CoreCivic's daily COVID-19 checklist ensures personnel monitor precaution measures, engage in ongoing communication, monitor and verify supply amounts, and conduct sanitation inspections. (*Id.* ¶ 18.)

- WCDC is operating at 74% capacity, and there are only 17 ICE detainees. (*Id.* ¶ 20.)

- WCDC has placed high-risk ICE detainees in protective cohorts. (*Id.* ¶ 27.) There are currently seven detainees assigned to a twelve-person dorm. (*Id.*)

- WCDC has limited contact between vulnerable detainees and the general population. (*Id.* ¶ 28.) All staff entering protective cohorts wear personal protective equipment, including masks and gloves. (*Id.*)

- Meals and medical services are provided on-unit. (*Id.*)

- Social visitation, community facility tours, volunteers, and facility audits have been suspended since March 13, 2020. (*Id.* ¶ 32.)

- All persons entering WCDC are subject to health screening consistent with CDC guidelines. (*Id.* ¶ 33.)

- Attorney visitors must bring their own personal protective equipment, and attorney visits are non-contact with a glass barrier. (*Id.* ¶ 39.)

- Detainees wear facial masks during escort and visits. (*Id.* ¶ 41.)

- Newly received detainees are screened at intake in accordance with CDC guidelines. Specifically, they are tested for fever and respiratory illnesses. (*Id.* ¶ 44.) If necessary, they are referred to a health provider. (*Id.* ¶ 45.)

- Intake groups are housed together for the initial 14 days. During this period, they are monitored daily for fever or respiratory symptoms. (Id. ¶ 47.)

- Detainees are educated on COVID-19 symptoms and prevention measures, including handwashing and the use of surgical masks, with flyers, televisions broadcasts, and biweekly meetings. (*Id.* ¶ 51–55.)

- Social distancing is encouraged. (*See id.* ¶ 61.)

- Detainees are provided free facial masks. (*Id.* ¶ 64.)

- Cleaning supply inventories are checked and restocked daily. (*Id.* ¶ 67.)

- Detainees are given access to liquid soap, paper towels, and sanitation supplies. (*Id.* ¶¶ 70, 75.)

- Detainees have been given hand sanitizer. (*Id.* ¶ 71.)

- Recreational equipment is cleaned before and after every recreation period. (*Id.* ¶ 79.)

- Frequently touched surfaces are cleaned several times per day. (*Id.* ¶ 80.)

- Detainees and staff have been educated on the appropriate steps to take if they believe they are infected. (*Id.* ¶ 83.)

- Any detainee with symptoms is to be isolated in the medical unit pending results. At-risk detainees are to be put in protective cohort housing. (*Id.* ¶¶ 84–87.)

The Rio Grande Detention Center has similarly taken actions to minimize the risk of COVID-19:

- RGDC is following ICE ERO's COVID-19 Pandemic Response Requirements. (Ex. 4 ¶ 9.)

- Social visitation has been suspended, and necessary visitors are screened. (Ex. 5 ¶ 14.)

- All detainees are likewise screened at intake. (Ex. 4 ¶¶ 10–11.) They are assessed for fever and respiratory symptoms, are asked to confirmed if they have had close contact with a person with COVID-19, and whether they have traveled through areas with his rates of the virus. (*Id.* ¶ 11.)

- Any detainee presenting with symptoms would be isolated and tested. (*Id.* ¶ 12.) If positive, the detainee would remain isolated and receive treatment. (*Id.*) If necessary, the detainee would be transported to a local hospital for treatment. (*Id.*)

- In the case of known exposure, asymptomatic detainees would be placed in cohorts with restricted movement for 14 days. (*Id.* ¶ 13.)

- At RGDC, the medical facility provides daily access to sick calls in clinical settings and has an onsite medical infirmary. (*Id.* ¶ 14.)

- The facility currently has no suspected cases of COVID-19 among the detainee population. (*Id.* ¶ 15.)

- One employee previously tested positive for COVID-19, but that employee had self-isolated for 20 days before she tested positive. (Ex. 5 ¶ 12.) She has had no contact with RGDC staff or detainees and has not yet returned to work. (*Id.*)

- RGDC is currently operating at just 19% capacity. (*Id.* ¶ 8.) Gonzalez's individual dorm is at 35% capacity. (*See id.* ¶ 9.)

- RGDC has increased its sanitation efforts in response to COVID-19. Cleaning is continuous throughout the day: shared equipment is cleaned several times per day, transport vehicles are cleaned thoroughly before, during, and after use. (Ex. 4 ¶ 17.)

- Every week, every housing area is disinfected with a foaming agent from the ceiling to the floor. (Ex. 5 ¶ 13.)

- Detainees are given three masks per week. (*Id.* ¶ 3.) Detainees are also given double the normal allotment of soap. (*Id.* ¶ 5.) If they ask for more, they will receive it. (*Id.*)

- Detainees are also educated on COVID-19 prevention procedures. (Ex. 4 ¶ 21.)

17

Based on these steps that Defendants have taken to protect detainees during the pandemic, Plaintiffs cannot show a constitutional violation. *See Sacal-Micha*, 2020 WL 1815691, at \*6 ("But ultimately, Sacal does not assert that Respondents are doing nothing to protect him, other detainees, and staff members from COVID-19, but only that Respondents are not doing *enough*. . . . Courts have refused to provide habeas relief even when the claimed inadequacies allegedly placed the petitioner in grave peril."). Further, to the extent Plaintiffs argue that all the steps taken by Defendants are still inadequate to "fully guarantee [Plaintiffs'] safety," that is not the applicable standard, and release is still not warranted. *See Sacal-Micha*, 2020 WL 1518861, at \*6. ("[I]t is possible that despite ICE's best efforts, Sacal may be exposed and contract the virus. . . . But the fact that ICE may be unable to implement the measures that would be required to fully guarantee Sacal's safety does not amount to a violation of his constitutional rights and does not warrant his release."). *See also Jorge V. S. v. Green*, 2020 WL 1921936, at \*3 (D.N.J. Apr. 21, 2020) ("That these steps [by ICE in accordance with CDC guidance for detention facilities] do not guarantee Petitioner will remain healthy and free of the disease is immaterial, the constitution requires no such perfection."); *Dawson v. Asher*, 2020 WL 1704324, at \*12 (W.D. Wash. Apr. 8, 2020) ("No one can entirely guarantee safety in the midst of a global pandemic. However, the standard under which the court evaluates Petitioners' second TRO motion is not guaranteed safety—an impossible standard to meet no matter the circumstances—but rather a likelihood of irreparable harm.").

### III.   Plaintiffs do not state claims under the Rehabilitation Act.

   **a.   Courts across the country do not recognize Rehabilitation Act claims by federal detainees, and Plaintiffs' claims relating to their removal procedures are barred.**

Plaintiffs bring claims under Section 504 of the Rehabilitation Act and allege that Defendants have failed to provide reasonable accommodations for their disabilities and have excluded them from federal programs or activities because of their disabilities. They seek either

improved conditions or release from custody. Plaintiffs do not state what improved conditions they would find satisfactory; rather, they simply allege that Defendants have failed to "employ[] the only known means of protecting [Plaintiffs] from infection." (Dkt. 1 ¶ 143.)

The Rehabilitation Act's remedies section does not provide for a private right of action for Plaintiffs. *See* 29 U.S.C. § 794a(a)(2) (providing causes of action only to those aggrieved by an action of a recipient of federal assistance or a federal provider of assistance); *see also De Dandrade v. U.S. Dep't of Homeland Sec.*, 367 F. Supp. 3d 174, 190–91 (S.D.N.Y. 2019). "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Where there is no express private right, courts "begin with the presumption that Congress did not intend one." *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007). Here, where the Rehabilitation Act expressly provides for causes of action and remedies for certain aggrieved persons but not for those aggrieved by Executive agencies, "there is strong indication that Congress did not intend for a private remedy to accompany the right to be free from discrimination from any Executive agency." *De Dandrade*, 367 F. Supp. 3d at 192. If Plaintiffs have a cause of action here, it would be implied only. *See Mathis, v. GEO Group, Inc.*, 2009 WL 10736631, at *6 (E.D.N.C. Nov. 9, 2009) (analyzing in depth the availability of a Rehabilitation Act claim by a federal detainee against his detention center).

Though Defendants are unaware of a Fifth Circuit ruling on the issue, courts across the country—including a court in this Circuit—have held that federal detainees may not bring Rehabilitation Act claims against the federal agencies housing them. *See, e.g.*, *Roark v. Flanery*, 2014 WL 4447451, at *27 (E.D. Tex. Sept. 9, 2014) ("[T]he Bureau of Prisons does not fit within the definition of 'programs or activities' governed by § 794(a)."); *Hurtado v. Reno*, 34 F. Supp. 2d 1261, 1264 (D. Colo. 1999) (holding that an immigration detainee could not bring a

Rehabilitation Act claim against INS, the predecessor to ICE); *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991) (holding that Rehabilitation Act does not apply to federal prisons); *Inko-Tariah v. Lappin*, 2009 WL 8652932, at *1 (E.D.N.C. Apr. 1, 2009), *aff'd*, 346 F. App'x 915 (4th Cir. 2009) ("Upon a thorough review of cases interpreting the application of the Rehabilitation Act, the court concludes that the Act does not provide a cause of action for inmates in federal prisons."); *Sandler v. Anderson*, 2008 WL 2610130, at *2 (W.D. Mo. July 2, 2008) ("[T]he Rehabilitation Act does not apply to federal inmates.").

Moreover, even if the Rehabilitation Act provided a claim as a general matter, Plaintiffs' claims here would be barred under 8 U.S.C. § 1252(b)(9) and (g). Those sections bar district courts from reviewing challenges to the removal process. When aliens brought due process, Administrative Procedure Act, and Rehabilitation Act claims challenging the holding of removal proceedings through video teleconferencing because the VTC policy harmed their "ability to meaningfully participate in their removal proceedings," the District Court for the Southern District of New York ruled that it did not have jurisdiction to hear their claims. *P.L. v. U.S. Immigration & Customs Enf't*, 2019 WL 2568648, at *2 (S.D.N.Y. June 21, 2019). The court held that challenges to "[h]ow immigrants appear for removal proceedings constitutes part of the process of these proceedings" and therefore are barred under § 1252(b)(9). *Id.* at *3. Because the plaintiffs were challenging "part of the process by which . . . removability will be determined," the court did not have jurisdiction. *Id.* To the extent Plaintiffs actually plead a lack of access to their removal proceedings, the same would be true here. If COVID-19 is somehow preventing Plaintiffs from pursuing their appeals (as discussed *infra*), that challenge falls squarely within § 1252's bar.

**b. Even if they could bring Rehabilitation Act claims, Plaintiffs allege in only conclusory fashion that they have been excluded from activities or programs because of their disabilities.**

The Fifth Circuit has held that claims under Title II of the ADA and claims under § 504 of the Rehabilitation Act be treated identically from a jurisprudential standpoint. *Bennett–Nelson v. Louisiana Board of Regents*, 431 F.3d 448, 454–55 (5th Cir.2005). To make out a prima facie case under Title II or the Rehabilitation Act, a plaintiff must show "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Cadena v. El Paso County*, 946 F.3d 717, 723 (5th Cir. 2020) (citation omitted).

A public entity's failure to make reasonable modifications or accommodations may constitute denial of services. *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014). But "[t]he ADA provides for reasonable accommodation, not preferred accommodation." *Arce v. Louisiana*, 226 F. Supp. 3d 643, 651 (E.D. La. 2016) (citing *EEOC v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009)). The accommodation of an inmate's disability need not be ideal; instead, it need only be reasonable and effective. *Id.* (citations omitted). Further, courts generally accord detention settings deference in determining the appropriate accommodations. *See Wells v. Thaler*, 460 F. App'x 303, 313 (5th Cir. 2012) ("[O]ur conclusion that the provided auxiliary aids and services are sufficient is informed by the context of this suit—a correctional facility—and we accord the officials at the Estelle Unit deference in their determination of an appropriate accommodation.").

"The ADA is not violated by 'a prison's simply failing to attend to the medical needs of its disabled prisoners.'" *Nottingham v. Richardson*, 499 F. App'x 368, 377 n.7 (5th Cir. 2012) (citing *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir.1996) and *Olmstead v. L.C. ex rel. Zimring*,

527 U.S. 581, 603 n.14 (1999) ("We do not in this opinion hold that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.'")). Instead, Plaintiffs must allege that they were "discriminated against based on th[eir] disability." *Id.* (denying Rehabilitation Act claim because "[t]here is no evidence that the allegedly improper action of leaving Nottingham on the floor of the transit van had any connection to his alleged disability" of having a "limited ability to walk").

Here, Plaintiffs have failed to allege any facts that they have been treated differently by reason of their alleged disabilities. They allege only in conclusory fashion that they are being excluded from the "removal process" and the detention centers' programs and activities because of their disabilities. (Dkt. 1 ¶ 141.) Plaintiffs do not allege, however, that they have actually been unable to attend a court hearing, or to submit any filings, or to speak with their counsel. Both Gonzalez and Olvera have been ordered removed and have appeals pending before the Board of Immigration Appeals—they have no reason to attend removal proceedings in person. Plaintiffs also do not set forth the detention center activities or programs in which they have not been able to participate or explain how releasing them would allow for their participation. Indeed, under Plaintiffs' logic, every detainee claiming a disability must be released under the Rehabilitation Act so that they may participate in the services of the detention facility. This proposed solution defeats its own purpose and shows why the Rehabilitation Act is an improper vehicle for Plaintiffs' grievances: release would totally deny Plaintiffs access to detention center services.

Further, Plaintiffs' failure-to-accommodate allegations are conclusory. They allege that ICE failed to "reasonably accommodate" Plaintiffs' "disabilities by failing to ameliorate the conditions that prevent [them] from employing the only known means of protecting themselves

from infection or by failing to release Petitioners from the Detention Centers." (Dkt. 1 ¶ 143.) Even if Plaintiffs otherwise had Rehabilitation Act claims, these allegations are insufficient to show that ICE's actions have been less than reasonable for several reasons.

First, Plaintiffs fail to cite any authority that remotely suggests that detainees subject to detention under the INA are entitled to release under the Rehabilitation Act so that they can participate in their removal proceedings. Second, the argument that release is a required "reasonable accommodation" so that detainees can participate in removal proceedings is absurd on its face because, as the Supreme Court has recognized, "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003). This is because "deportation proceedings 'would be vain if those accused could not be held in custody pending the inquiry into their true character.'" *Id*. (quoting *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)); *Carlson v. Landon*, 342 U.S. 524, 538 (1952) ("Detention is necessarily a part of . . . deportation.").

Moreover, Plaintiffs acknowledge that ICE has taken numerous steps to protect detainees. (*See e.g.*, Dkt. 1 ¶ 68 ("On April 4, 2020, ICE determined that its Field Office Directors should reassess custody of detainees 'over 60 years old' and detainees who are 'immune-compromised,' including individuals with 'heart disease.'"); *id.* ¶ 69 ("On or about April 13, 2020, . . . Respondent ICE issued a policy document for ICE detention facilities requiring detention facilities to take certain measures regarding COVID-19 . . .").) These documents provide guidance and directives as to individuals whose custody status should be re-assessed, as well as the mandated practices regarding "social distancing" measures, "hygiene," "cleaning/disinfecting practices," "signage," and other requirements. While Plaintiffs may argue nothing short of release is adequate, the Rehabilitation Act requires "reasonable" accommodations, not their preferred accommodation.

**IV.    This Court should not micromanage the detention centers' measures to prevent COVID-19.**

This Court should not force the detention centers to implement particular measures in response to COVID-19. First, as a matter of judicial comity, this Court should not order improved conditions while the Central District of California is already in the process. *See Fraihat v. U.S. Immigration & Customs Enf't*, 2020 WL 1932570, at *16, 29 (C.D. Cal. Apr. 20, 2020) (certifying a nationwide class of vulnerable ICE detainees with Fifth Amendment and Rehabilitation Act claims, and ordering preliminary relief). A different ruling here risks conflicting instructions.

Second, at this stage, any improvements ordered by the Court would be *sua sponte*. Plaintiffs vaguely ask the Court to "order Respondents to provide Petitioners with protection from the risk of contracting COVID-19 by ameliorating all conditions that prevent Petitioners from implementing the public health recommendations that are the only known means of preventing against and mitigating the effects of COVID-19." (Dkt. 1 at 36.) But Plaintiffs do not articulate what this order might look like.

Third, assuming Plaintiffs would ask this Court to order detailed preventative measures, the Fifth Circuit recently ruled that doing so is improper. The Fifth Circuit stayed an injunction against TDCJ that "regulates in minute detail the cleaning intervals for common areas, the types of bleach-based disinfectants the prison must use, the alcohol content of hand sanitizer that inmates must receive, mask requirements for inmates, and inmates' access to tissues (among many other things)." *Valentine*, 2020 WL 1934431, at *1. Finding that TDCJ was likely to succeed in its appeal, the Fifth Circuit noted, "Although the district court might do things differently, mere 'disagreement' with TDCJ's medical decisions does not establish deliberate indifference." *Id.* at *4. The court further noted that the harm to TDCJ was "particularly acute" because the order "interferes with the rapidly changing and flexible system-wide approach that TDCJ has used to

24

respond to the pandemic so far." *Id.* at \*5. The same would be true here where ICE's response is continually evolving to combat COVID-19. (*See* Ex. 10 ¶ 14 & Ex. 14 at 3.)

### V.     The public interest favors Plaintiffs' continued detention.

Concern for potential exposure to COVID-19 is shared by all, but mandating release of ICE detainees is against the public interest. The public interest in enforcement of immigration laws is significant. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556–58 (1976); *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, an immigration judge and the BIA have determined that Olvera is a flight risk due to his criminal history, tremendous financial resources, and the likelihood that he will fail in challenging his removal.[2] *See Sacal-Micha*, 2020 WL 1815691, at \*8 ("Sacal also admits that he possesses significant financial resources, which despite his counsel's best efforts, could provide him with options that pose a flight risk, especially when considering that he faces possible deportation and has already fled his home country to avoid prosecution."). Gonzalez, who is in a similar position appealing his removal order, also presents a risk of flight.

The public interest is also best served by allowing the orderly medical processes and protocols implemented by government professionals to remain in place. *See Youngberg v. Romeo*, 457 U.S. 307, 322–23 (1982). The detention centers at issue here have taken extensive proactive steps to try to prevent the introduction of COVID-19 into the facilities.

### Conclusion

Defendants respectfully request that the Court dismiss Plaintiffs' claims in their entirety.

---

[2]     *See also* Doris Gómora, "Mexico has requested the arrest of Olvera Amezcua to the US," EL UNIVERSAL (Jan. 16, 2015), https://archivo.eluniversal.com.mx/in-english/2015/mexico-ficrea-rafael-antonio-olvera-amezcua-arrest-order-extradition-us-100202.html ("The Mexican government requested the arrest of Rafael Olvera Amezcua, main stockholder of Ficrea, to the US authorities, in order to extradite him to face charges for fraud for over 2.7 billion pesos (US$184.9 million) against 6,848 savers."); Braulio Carbajal, "Por Covid-19, ex dueño de Ficrea pide seguir su proceso en libertad," LA JORNADA (Apr. 16, 2020), https://www.jornada.com.mx/ultimas/economia/2020/04/16/por-covid-19-ex-dueno-de-ficrea-pide-seguir-su-proceso-en-libertad-3000.html.

Respectfully submitted,

RYAN K. PATRICK
United States Attorney

By: */s/ Ariel N. Wiley* _____

**Ariel N. Wiley**
Assistant United States Attorney
*Attorney-in-Charge*
Southern District No. 2554283
Texas Bar No. 24093366
**Annalisa L. Cravens**
Assistant United States Attorney
Southern District No. 2791281
Texas Bar No. 24092298
1000 Louisiana Street, Suite 2300
Houston, Texas 77002
Tel.: (713) 567-9000
Fax: (713) 718-3303
Email: Ariel.Wiley@usdoj.gov
Email: Annalisa.Cravens@usdoj.gov

*Counsel for Respondents/Defendants*

## Certificate of Service

I certify that on April 24, 2020, this document was filed by CM/ECF, which will serve a copy on all counsel registered.

*/s/ Ariel N. Wiley* _____
Ariel N. Wiley
Assistant United States Attorney